[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13605

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 22, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-20939-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE LOPEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 22, 2009)

Before BARKETT and HULL, Circuit Judges, and SCHLESINGER,* District
Judge.

HULL, Circuit Judge:

---

*Honorable Harvey E. Schlesinger, United States District Court for the Middle District of
Florida, sitting by designation.

Jose Lopez appeals his convictions for (1) conspiring to encourage or induce an alien to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count 1), (2) encouraging or inducing 17 aliens to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) (Counts 2-18), and (3) and knowingly aiding or assisting an alien, who was inadmissible under 8 U.S.C. § 1182(a)(2) due to a prior aggravated felony conviction, to enter the United States, in violation of 8 U.S.C. § 1327 (Count 19). After careful review and oral argument, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lopez was indicted with two other codefendants, Jorge Carnet-Castro ("Carnet-Castro") and Carlos Monge ("Monge"), on a 19-count indictment alleging the three defendants conspired to encourage or induce 17 aliens to unlawfully enter the United States. The U.S. Coast Guard ("USCG") intercepted the defendants while they were traveling by a boat, driven by Lopez, from the Bahamas heading westward towards Miami. A search of the vessel revealed 17 aliens in the boat's forward cabin.

Lopez initially pleaded not guilty. Lopez later attempted to change his plea to guilty. During the plea colloquy, Lopez stated to the district court that when he went to the Bahamas by boat with the other two codefendants he was unaware that the purpose of their trip was to smuggle aliens to the United States, but that he

2

became aware during the voyage that the aliens onboard were illegal.  Based upon these statements, the district court refused to accept Lopez's guilty plea.[1]

The case proceeded to trial, at which the following evidence was produced.

## A.  The Government's Evidence

The government presented the testimony of USCG Bosun's Mate First Class Matthew Parker, who captained the USCG vessel that stopped the boat Lopez was driving approximately a mile from Baker's Haulover Inlet, Miami.  Officer Parker saw Lopez driving the boat, with approximately 8-10 people on the boat's deck.  Upon being questioned in Spanish by another USCG officer, Lopez identified the others on deck as his friends from Miami and that they had returned from a fishing trip.  USCG officers asked Lopez and the others to produce identification.  Lopez and his codefendants Carnet-Castro and Monge produced identification, but Lopez stated that the other passengers had left their identifications at the boat ramp.  Officer Parker boarded the vessel Lopez was driving and, while conducting a safety inspection, discovered approximately 10-12 people in the boat's forward cabin.  Upon being asked who those individuals were, Lopez initially stated the only people on the boat were the people on the boat's main deck.

The government also presented the testimony of USCG officer Jonathan

---

[1]Lopez makes no claim that the district court should have accepted his attempted plea.

LaSalle, who was also on board the USCG vessel that stopped the boat Lopez was piloting. Officer LaSalle testified consistent with Parker. Officer LaSalle also stated he was told by Carnet-Castro that Lopez and his codefendants had picked the aliens up from a vessel in the ocean.

Special Agent Eric Moreno, of U.S. Immigrations and Customs Enforcement, testified that he questioned Lopez upon arriving at the scene. Lopez stated to Agent Moreno that he was driving the boat, which he did not own, from the Lucaya Freeport area in the Bahamas. Lopez stated they had gone to the Bahamas to test the boat. Lopez stated he was taking the aliens on board the boat to a marina in Miami, where two waiting vans were going to pick up the aliens, in exchange for which he would receive a gift. In an interview conducted the following day, Lopez told Moreno that he and the two other codefendants had met with a Bahamian while in the Bahamas, who directed them to an abandoned hotel to pick up the aliens. Moreno also testified that his investigation of the seventeen aliens on board the boat revealed that none of them had legal status to enter the United States and one, Pedro Valdez-Alvarado, had previously been deported for a felony drug conviction.

The government also presented the testimony of codefendant Carnet-Castro, who had pled guilty and agreed to cooperate with the government. Carnet-Castro

testified that he met Lopez in connection with a business deal Lopez had made to smuggle aliens to the United States from Cuba. Carnet-Castro testified that he had made one previous alien-smuggling trip with Lopez from the Freeport area of the Bahamas, in October 2007. Carnet-Castro testified Lopez earned $20,000 for his participation in this previous smuggling trip.

Codefendant Carnet-Castro also testified about the events that culminated in Lopez's arrest. Carnet-Castro, Lopez, and Monge, Carnet-Castro's nephew, left Miami in the morning. Lopez piloted the boat to the Bahamas, where the three defendants stayed in a hotel for the night. Carnet-Castro testified that they called their contact in the Bahamas, who advised them to pick up the aliens at an abandoned hotel in Port Lucaya. Carnet-Castro testified that he and Lopez were to split the proceeds of the trip – about $4,000 per person smuggled – after deducting expenses. Lopez drove the boat back from the Bahamas towards Miami, with the exception of about fifteen minutes. Carnet-Castro explained that when they were stopped by the USCG, he initially lied and said that the aliens were not illegal, when he knew they were, but that he later told the truth after being arrested. On cross-examination, Carnet-Castro testified that Lopez knew why they were going to the Bahamas.

The parties stipulated that the 17 aliens on board the boat Lopez was driving

could not legally enter the United States, after which the government closed its case. Lopez moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29, which the district court denied.

**B.** **Lopez's Testimony**

Lopez testified in his defense. Lopez testified that his brother-in-law introduced him to codefendant Carnet-Castro as a fellow former inmate. Lopez stated that the day before his arrest he had taken his brother-in-law to a clinic in Miami. While there, Lopez spoke with Carnet-Castro, who asked him to help him test a friend's boat Carnet-Castro was repairing, because Lopez was an experienced boater. Lopez agreed. Mechanics who had fixed the boat's engine suggested that Carnet-Castro test the boat thoroughly. Lopez, Carnet-Castro, and Monge, Carnet-Castro's nephew, left the marina to test the boat in a bay. After testing the boat in the bay, the men returned to the marina, purchased fuel and water, and Carnet-Castro suggested going out to the open ocean where there were waves. Once off the Florida coast, codefendant Carnet-Castro suggested that they continue to the Bahamas so that codefendant Monge could see the islands. Lopez agreed, stating they would have to be quick so that he could retrieve his brother-in-law from the clinic. They left at approximately 12:30 to 1:00 in the afternoon, arriving in the Bahamas around 3:00 p.m. Lopez telephoned his brother-in-law at the clinic and

6

explained to him that he was going to the Bahamas and did not know if he would be back in time to pick him up.

In the Bahamas, the men attempted to purchase gas at a marina because they did not have enough fuel for the return trip, but the marina was out of gas. Lopez tied up the boat and left it to get some food. Lopez purchased sandwiches with money from Carnet-Castro and returned to the boat, where he saw Carnet-Castro conversing with a man, who left as soon as Lopez returned. Lopez used a satellite phone to call his wife and inform her that he would be home late and for her to call his brother-in-law at the clinic. Lopez did not tell his wife he was in the Bahamas. The men agreed to stay at a hotel in the Bahamas. While there, Carnet-Castro met up at a nearby bar with the same man Lopez had seen before. Carnet-Castro stated to Lopez that the man would provide gas to them in the morning and that Carnet-Castro had agreed as a favor to transport some people to Miami. Lopez asked Carnet-Castro if the people to be transported had papers to enter the United States. Carnet-Castro stated they did. Lopez agreed to transport the people, because Carnet-Castro was in charge of the boat.

The next morning, the same man Lopez had seen the night before led them to a marina with gas and gave Carnet-Castro approximately $400.00. The man then directed Carnet-Castro to an abandoned hotel. They met the aliens at this

hotel. As the aliens boarded, Lopez intended to check their immigration status, but Carnet-Castro told him to take the boat's helm. Lopez was the driver of the boat during the entire voyage back to the United States, except for about ten minutes while he was changing his shirt.

During the voyage, but before being stopped by the USCG, codefendants Carnet-Castro and Monge spoke on the phone with the man they had met in the Bahamas, and Carnet-Castro informed Lopez that the aliens were illegal. Lopez stated that he and Carnet-Castro argued about the aliens' status. Lopez stopped the boat, but he did not know what to do because he was in the middle of the sea and was concerned Carnet-Castro, Monge, and the aliens might go against him. Lopez resumed driving the boat towards the United States and was eventually stopped by the USCG.

On cross-examination, Lopez admitted to knowing codefendant Carnet-Castro for 3 to 4 years. Lopez denied ever smuggling aliens with Carnet-Castro before. Lopez admitted that he did not tell the same story he had testified to at trial when he was interviewed by Agent Moreno after his arrest. Lopez originally told USCG officers that he had picked up the aliens during a pleasure cruise, but he admitted at trial that this statement was false. Lopez admitted that he did not inquire if gas was available elsewhere after the first marina in the Bahamas advised

8

them it was out of gas. Lopez claimed that he was not suspicious about picking up the aliens, that he did not know the hotel was abandoned, and that he did not believe the boat was overcrowded. Although Lopez admitted he was concerned about bringing back so many people, he never asked them for their immigration documentation.

At the close of evidence, Lopez moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29 as to Counts 1-18, but not 19. Lopez argued the government had failed to prove that he had "encouraged or induced" aliens to enter the United States, and that the government had instead shown only that Lopez attempted to smuggle aliens, a crime not charged. The district court denied Lopez's motion.

C.    **Closing Arguments and Jury Instructions**

Lopez did not file proposed jury instructions. During the charge conference, the government proposed that two dictionary definitions be given for the definitions of "encourage" and "induce." Lopez objected.[2] The district court did not instruct the jury using the government's definitions, but permitted the parties to argue their positions on the common meanings of "encourage" and "induce" in

---

[2]The government originally proposed the following definition for encourage: "To 'encourage' means to instigate, to incite to action, to give courage to, to inspirit, to embolden, to raise confidence, to help, to forward, and/or to advise." The government cited Black's Law Dictionary in support of this proposed definition. Lopez and the government agreed that the definition proposed by the government was taken from Black's Law Dictionary.

9

closing arguments without referring to specific dictionaries.

During closing arguments, the prosecutor argued twice that Carnet-Castro and Monge had pled guilty and "accepted responsibility," while Lopez was "the only person in this case who has not accepted responsibility." After both comments, the district court sustained Lopez's counsel's objection, struck the statements, and denied Lopez's motions for a mistrial. After the second comment, the district court also instructed the jury not to consider the government's last argument.

During deliberations, the jurors sent a note to the court asking this question about "encourage" or "induce" with respect to Counts 2-18:

> Does the first element "Defendant knowingly encouraged and induced persons named in the indictment to come to or enter the United States in violation of law" require that the Defendant communicate with persons named in the indictment, orally or by gesture, in order to "encourage" or "induce" such persons?

The government again requested that the court instruct the jury using the dictionary definitions already suggested by the government. Lopez objected to this, arguing that the proposed definition of "encourage" included "to help" and the term "encourage" as it was commonly understood required more than just "helping."[3]

---

[3]Lopez only specifically objected to the inclusion of "to help" in the government's proposed definition of "encourage." On appeal, Lopez does not contest any other specific portion of the district court's supplemental definition of "encourage" other than the inclusion of

10

The district court, over Lopez's objection, gave the jury these dictionary

definitions of "encourage" and "induce:"

> In response to your question concerning "encourage" and "induce," I instruct you on the below dictionary definitions in conjunction with all of the Court's instructions in your deliberations.
>
> To "encourage" means to knowingly instigate, to incite to action, to give courage to, to inspirit, to embolden, to raise confidence, to help, to forward, and/or to advise.
>
> To "induce" means to knowingly bring on or about, to affect, cause to influence an act or course of conduct, lead by persuasion or reasoning, incite by motives, and/or to prevail on.

The jury also asked this question pertaining to the knowledge required as to

the § 1327 offense in Count 19:

> Does the second element of the crime, "that the Defendant knew the alien was inadmissible in the United States," require that the defendant had personal knowledge that the alien was inadmissible in the United States at the time the alien boarded the boat outside of, or before it entered the United States?

After discussing the issue with counsel and over Lopez's objection, the district

court sent back its written answer that: "Section 1327 does not contain a temporal

requirement."

After the jury submitted another note indicating that they were deadlocked

---

"to help."

11

on all but one count, the district court, over Lopez's objection and motion for a mistrial, gave a modified <u>Allen</u> charge.[4]  Two hours later, the jury returned with a unanimous verdict of guilty on all counts.  Lopez's counsel orally sought a judgment of acquittal and a new trial based upon the government's failure to prove encouragement and inducement; the district court denied both motions.

Lopez's counsel filed a written motion for a new trial, predicated upon the argument that the district court's supplemental instruction on the definition of "encourage" impaired the effectiveness of defense counsel's arguments and that Lopez was prejudiced and entitled to have his convictions reversed.  The district court denied Lopez's motion for a new trial.  The district court sentenced Lopez to 63 months' concurrent imprisonment on Counts 1 and 19 and 60 months' concurrent imprisonment on Counts 2-18, followed by 2 years of supervised release.  Lopez timely appealed his convictions.[5]

## II.  DISCUSSION

### A.    Standard of Review for Jury Instructions

On appeal, Lopez raises several issues regarding the district court's jury instructions.  We review a district court's response to a jury question for an abuse

---

[4]<u>Allen v. United States</u>, 164 U.S. 492, 501-02, 17 S. Ct. 154, 157 (1896).

[5]On appeal, Lopez raises no issues as to the advisory guidelines calculations or the legality of his sentences.

of discretion. United States v. Wright, 392 F.3d 1269, 1279 (11th Cir. 2004).

While the district court has considerable discretion regarding the extent and

character of supplemental jury instructions, it does not have discretion to misstate

the law or confuse the jury. See United States v. Sanfilippo, 581 F.2d 1152, 1154

(5th Cir. 1978) (holding that no reversible error exists if the district court's original

and supplemental instructions accurately present the substantive law).[6] "A

challenged supplemental jury instruction is reviewed as part of the entire jury

charge, in light of the indictment, evidence presented and argument of counsel to

determine whether the jury was misled and whether the jury understood the

issues." United States v. Johnson, 139 F.3d 1359, 1366 (11th Cir. 1998) (internal

quotation marks omitted). A district court's refusal to give a requested jury

instruction is reviewed for abuse of discretion, and "[w]e reverse when we are left

with a substantial and ineradicable doubt as to whether the jury was properly

guided in its deliberations." United States v. Grisby, 111 F.3d 806, 814 (11th Cir.

1997) (internal quotation marks omitted).[7]

**B.      Supplemental Jury Instruction Defining Encourage in 8 U.S.C. § 1324(a)(1)(A)(iv)**

---

[6]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[7]We review the correctness of jury instructions de novo to determine if they misstate the law or mislead the jury to the prejudice of the objecting party. Id.

13

Lopez argues that his convictions under Counts 1-18 should be vacated and the case remanded for a new trial because the district court's supplemental instruction, providing a definition of the term "encourage" in § 1324(a)(1)(A)(iv), was erroneous as a matter of law.[8]  Lopez first argues that the supplemental instruction was erroneous because "encourage" should have been accorded its "ordinary" meaning and the definition was not necessary.

To establish violations of § 1324(a)(1)(A)(iv) in Counts 1-18, the government must prove beyond a reasonable doubt that the defendant "encourag[ed] or induc[ed] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law[.]"  8 U.S.C. § 1324(a)(1)(A)(iv).  It is undisputed that the terms "encourage" and "induce" are undefined in the statute.

When a statutory term is undefined, courts give it its "ordinary meaning" or "common usage."  United States v. Santos, 128 S. Ct. 2020, 2024 (2008); CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001).  To ascertain ordinary meaning, courts often turn to dictionary definitions for guidance.

---

[8]The jury's note requested clarification of the district court's instructions as to Counts 2-18, charging violations of 8 U.S.C. § 1324(a)(1)(A)(iv).  Count 1 charges conspiracy to violate § 1324(a)(1)(A)(iv), in violation of 8 U.S.C. § 1324(a)(1)(A)(v).  Count 1 thus incorporates the district court's definition of encourage, and Lopez's argument is properly considered for all of Counts 1-18.

Santos, 128 S. Ct. at 2024 (noting the term "proceeds" can be defined through dictionary definitions as either "receipts" or "profits"); United States v. Murrell, 368 F.3d 1283, 1287 (11th Cir. 2004) (citing The American Heritage Dictionary of the English Language for the plain and ordinary meaning of "induce"); United States v. McNab, 331 F.3d 1228, 1237 (11th Cir. 2003) (citing Black's Law Dictionary and Merriam Webster's Collegiate Dictionary for definitions of "law"); CBS, 245 F.3d at 1223 (using the American Heritage College Dictionary to confirm the common usage of "termination"). Thus the district court did not err in using dictionary definitions of encourage.

Even if the district court's use of dictionary definitions is permissible, Lopez argues the district court should not have included "to help" in the definition of "encourage." This argument lacks merit, however, as multiple dictionaries include "to help" in the definition of "encourage." For example, in Black's Law Dictionary, "encourage" means "[t]o instigate; to incite to action; to give courage to; to inspirit; to embolden; to raise confidence; to make confident; to help; to forward; to advise." Black's Law Dictionary 620 (4th ed. 1968); see also Black's Law Dictionary 568 (8th ed. 2004) (defining "encourage" as "[t]o instigate; to incite to action; to embolden; to help."); Webster's Third New Int'l Dictionary 747 (1993) (defining "encourage" as "to give courage to: inspire with courage, spirit, or

15

hope: to spur on: to give help or patronage to"). The dictionary definitions of "encourage" are internally consistent and also consistent with the district court's supplemental instruction.[9]

In addition, at least one of our sister circuits has considered the definition of "encourage" in § 1324(a)(1)(A)(iv) and reached the same conclusion to use dictionary definitions, including "to help," in formulating jury instructions. In United States v. He, 245 F.3d 954, 957 (7th Cir. 2001), the Seventh Circuit affirmed the district court's usage of a dictionary in defining the term "encourage" in § 1324(a)(1)(A)(iv) as "to knowingly instigate, help or advise." The Seventh Circuit reasoned: "[t]he supplemental instruction was a correct statement of the law . . . . These definitions were taken directly from Black's Law Dictionary and conform to other dictionary definitions of those words. See, e.g., Merriam Webster's Collegiate Dictionary 381 (10th ed. 1996) (defining "encourage" as "to inspire with courage, spirit, or hope . . . to spur on . . . to give help or patronage to")." He, 245 F.3d at 959-60.

---

[9]Lopez argues the district court should have used "ordinary" dictionaries, such as Webster's Third New International Dictionary, and not Black's Law Dictionary, to determine the ordinary meaning. The only "ordinary" dictionary definition cited by Lopez is to an online dictionary listing "help" as a synonym for "encourage." See http://dictionary.reference.com/browse/encourage. Webster's Third New International Dictionary includes "to give help" as part of its definition of "encourage." Supra. Lopez's argument thus is not persuasive considering that both "ordinary" dictionaries and Black's Law Dictionary include "to help" as a potential definition of "encourage."

16

Lopez alternatively argues that "encourage" cannot mean "to help" in § 1324(a)(1)(A)(iv) because construing "encourage" that broadly would render at least two other provisions of § 1324 superfluous – namely, 8 U.S.C. §§ 1324(a)(1)(A)(i) and 1324(a)(1)(A)(v)(II).

A dictionary definition of an undefined statutory term is not always dispositive, and we still may consider the statutory term as it is used in the context of the statute as a whole. Santos, 128 S. Ct. at 2024 ("Since context gives meaning, we cannot say [a statute] is truly ambiguous until we consider [the disputed statutory term] not in isolation but as it is used in the [statute].");see also Murrell, 368 F.3d at 1287 (construing "induce" in 18 U.S.C. § 2422(b) as the second of two different dictionary definitions because, when viewed in context, the first dictionary definition would render another term in § 2422(b), "persuade," as superfluous); CBS, 245 F.3d at 1225-26 ("One canon recognized by the Supreme Court is that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted).

However, an examination of §§ 1324(a)(1)(A)(i) and 1324(a)(1)(A)(v)(II) shows that the definition of "to help" for "encourage" in § 1324(a)(1)(A)(iv) does

17

not render superfluous these other two subsections of § 1324.

First, § 1324(a)(1)(A)(iv), with which Lopez was charged, criminalizes "encouraging or inducing" an alien to come to the United States knowing or in reckless disregard that the alien's coming to the United States is in violation of law. The elements of § 1324(a)(1)(A)(iv) are: (1) encouraging or inducing; (2) an alien; (3) to come to, enter, or reside in the United States; and (4) knowing or in reckless disregard that the alien's coming to, entering, or residing in the United States is illegal. The fourth element requires that the alien's coming to, entry, or residence in the United States is illegal and that the defendant knew or recklessly disregarded that.

In contrast, § 1324(a)(1)(A)(i) makes it a crime to knowingly bring or attempt to bring an alien to the United States <u>at a place other than a designated port of entry</u>, regardless of whether the alien can legally be admitted into the United States.[10] The elements of § 1324(a)(1)(A)(i) are: (1) knowing that a person is an

---

[10]Subsection 1324(a)(1)(A)(i) provides:
(1)(A) Any person who –
(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
. . .
shall be punished as provided in subparagraph (B).

18

alien; (2) bringing or attempting to bring; (3) an alien; (4) to the United States; (5) at a place other than a designated port of entry or other authorized place; and (6) regardless of whether the alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future action that may be taken with respect to the alien.

An examination of the elements of these two subsections shows that defining "encourage" as "to help" does not turn an offense under § 1324(a)(1)(A)(iv) into an offense under § 1324(a)(1)(A)(i). Subsection 1324(a)(1)(A)(i) criminalizes more than the mere act of bringing an alien to the United States because it also requires that the alien be brought to a place other than a port of entry, which is different conduct than what is covered by § 1324(a)(1)(A)(iv). And § 1324(a)(1)(A)(i) applies to aliens with prior official authorization to enter, whereas § 1324(a)(1)(A)(iv) applies to aliens whose entry is illegal. Accordingly, we do not agree with Lopez that his conviction under § 1324(a)(1)(A)(iv) renders § 1324(a)(1)(A)(i) superfluous.[11]

_____

8 U.S.C. § 1324(a)(1)(A)(i).

[11]The dissent focuses on § 1324(a)(2), which criminalizes "bring[ing] or attempting to bring" an alien into the United States; but § 1324(a)(2) further requires that the violator act with knowledge or reckless disregard of the specific fact that "an alien has not received prior official authorization to come to, enter, or reside in the United States." 8 U.S.C. § 1324(a)(2). Lopez did not raise this subsection in his appellate brief, and thus any argument with respect to it is deemed waived. Tanner Adver. Group, L.L.C. v. Fayette County, 451 F.3d 777, 785 (11th Cir. 2006). In any event, § 1324(a)(2) is violated only if the defendant acts with knowledge or

In turn, § 1324(a)(1)(A)(v)(II) criminalizes aiding or abetting the commission of any of the preceding acts in subsection 1324(a)(1)(A), including both 1324(a)(1)(A)(i) and 1324(a)(1)(A)(iv). Subsection 1324(a)(1)(A)(v)(II) cannot be superfluous on its own without reference to the underlying subsections, and since subsection 1324(a)(1)(A)(i) is not rendered superfluous by the district court's interpretation of subsection 1324(a)(1)(A)(iv), neither is subsection 1324(a)(1)(A)(v)(II).[12]

In any event, in other decisions in this circuit, the act of "helping" aliens come to, enter, or remain in the United States were deemed violations of subsection 1324(a)(1)(A)(iv). United States v. Ndiaye, 434 F.3d 1270, 1278 (11th Cir. 2006); United States v. Kuku, 129 F.3d 1435 (11th Cir. 1997). In Ndiaye, this Court affirmed a conviction under subsection 1324(a)(1)(A)(iv) for "assist[ing] over seventy Indonesian aliens in securing Social Security numbers." The defendant had argued his actions could not constitute a violation of the statute

reckless disregard of "the fact that an alien has not received prior official authorization" to enter the United States, which is a different requirement than § 1324(a)(1)(A)(iv)'s lesser requirement that the alien be in violation of law for any reason. And as detailed throughout this opinion, Lopez's conduct was not merely piloting a boat as the dissent asserts.

[12]Which isn't to say the conduct proven in this case might not also violate portions of Section 1324 other than what was charged. Lopez's argument seems to be that his conduct can only lawfully violate one subsection of a statute. Nothing in our precedent compels this conclusion. See United States v. Cespedes, 151 F.3d 1329, 1332 (11th Cir. 1998) ("Indeed, the federal courts have long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.") (internal quotation marks omitted).

because "[a] Social Security card did not change anyone's status, and there was no evidence that anyone was 'induced' to live here by obtaining such a card." Ndiaye, 434 F.3d at 1296. This Court affirmed Ndiaye's conviction because, "[a] jury could find that [the defendant's] assistance in helping [an alien] obtain a Social Security card, which the evidence established he is not entitled to have, encouraged or induced him to reside in this country in violation of the statute." Id. at 1298 (emphasis added). Similarly, in Kuku, we affirmed a conviction under subsection 1324(a)(1)(A)(iv) for approving applications for social security cards without proper documentation filed on behalf of illegal aliens. Kuku, 129 F.3d at 1437; see also Ndiaye, 434 F.3d at 1298 ("[I]n Kuku, this Court has implicitly recognized that conduct which involved helping an illegal alien obtain a Social Security card to which he was not entitled so that he could work and live in this country was sufficient to support a conviction under § 1324(a)(1)(A)(iv).").

Lopez argues that his conduct was not as extensive as the defendant in United States v. Hanna, 639 F.2d 192, 193 (5th Cir. Unit B 1980), another decision where we affirmed a defendant boat captain's conviction for encouraging or inducing the unlawful entry of 148 Haitian aliens. In Hanna, the government proved at trial that the defendant was captain of a vessel that picked up 148 Haitians from two ports in Haiti, that he was employed to take the boat to Miami,

21

that he assisted aliens in boarding the boat, that during the voyage the defendant acquired provisions for the passengers, and that he constructed an alibi to give police upon his arrival with the aliens in the United States. Id.[13]

The trial evidence established that Lopez was more than a mere passive boat driver in this endeavor. That evidence showed that: (1) Lopez and Carnet-Castro made a previous alien-smuggling trip from the Bahamas shortly before the incidents in this case, for which Lopez earned $20,000; (2) Lopez and Carnet-Castro were to split the proceeds of this trip, and Lopez knew why they were going to the Bahamas; (3) Lopez lied to USCG officers when he was initially stopped, concocted a story about being out on a fishing trip, lied about whether the aliens had residency documentation, and pretended the only aliens on board were those up on deck; and (4) Lopez participated in picking up the aliens from an abandoned

---

[13]Similar to the current version of Section 1324, the previous version of Section 1324 considered in the Hanna decision criminalized encouraging or inducing illegal aliens to enter the United States. The previous version of Section 1324 provided:

> (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or cosignee of any means of transportation who –
> . . . .
> (4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of –
> any alien . . . not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony . . . .

8 U.S.C. § 1324(a)(4) (1976 & Supp. IV 1981).

hotel, and he acquiesced in accepting money from an unidentified man in the Bahamas for doing so. Contrary to Lopez's characterization, this is not a case where he merely drove a boat full of aliens from the Bahamas to the United States. Rather, Lopez first had to take a boat to the Bahamas, refuel it, spend the night, pick up the aliens from an abandoned hotel, and then go to the marina and come back to the United States.[14] Simply put, Lopez's conduct in this case was more than adequate to convict him under § 1324(a)(1)(A)(iv).

## C.     Federal Rule of Criminal Procedure 30

Lopez asserts a corollary argument that the district court's supplemental jury instruction violated Federal Rule of Criminal Procedure 30 because the district court contradicted its earlier decision not to define "encourage" as "to help," and therefore Lopez's counsel could not respond to the definition instruction during closing argument.

Federal Rule of Criminal Procedure 30 requires a district court, when requested, to inform counsel of its proposed action upon requested jury instructions prior to closing arguments. Fed. R. Crim. P. 30. "This Court has only required substantial compliance with Rule 30 and a defendant must show prejudice before his conviction will be reversed." United States v. Clark, 732 F.2d 1536, 1541

---

[14]To say, as the dissent argues, that Lopez is being convicted of the mere act of driving a boat is to ignore the record in this case.

23

(11th Cir. 1984). "Such prejudice occurs when the change in the instructions is substantial, when the instructions repudiate counsel's arguments, or when the instructions impair the effectiveness of those arguments." United States v. Descent, 292 F.3d 703, 707 (11th Cir. 2002).

However, our precedent also affords district courts discretion to expand upon initial jury instructions when a jury question arises. United States v. McDonald, 935 F.2d 1212, 1222 (11th Cir. 1991) ("A trial court's response to a jury's question is entrusted to its own sound discretion and a conviction will not be reversed in the absence of an abuse of discretion."); see also Bollenbach v. United States, 326 U.S. 607, 612-13, 66 S. Ct. 402, 405 (1946) ("When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."); United States v. Rodriguez, 765 F.2d 1546, 1553 (11th Cir. 1985) ("A trial judge has some obligation to make reasonable efforts to answer a question from the jury."). This is particularly true here where the district court determined during the charge conference that the parties could argue their positions on the common meanings of "encourage" and "induce." Moreover, the supplemental instruction contained a correct definition of "encourage." Thus the fact that the district court acceded to Lopez's initial request not to define "encourage" did not bind or preclude the district court from expanding upon its instructions when the

24

jury had questions.

In any event, we cannot say Lopez has shown that the district court's supplemental jury instruction repudiated Lopez's arguments or impaired their effectiveness. During closing arguments, before the supplemental instruction, Lopez's counsel argued that Lopez was guilty only of attempting to bring the aliens into the United States and not guilty of encouraging or inducing them to enter the United States, as follows:

> The charge is encouraging or inducing someone to come to the United States. That's very, very important in this case, encouraging or inducing someone to come to the United States. You heard all the evidence. What evidence is there that Mr. Lopez, in fact, Mr. Carnet-Castro or Mr. Castro's nephew, or anyone, encouraged or induced someone to come here who wasn't coming here anyway?
> . . . .
> So, there has been no evidence, none, that either Mr. Lopez or Mr. Carnet-Castro or his nephew encouraged or induced anybody . . . .
> Now, if you believe all the Government's evidence, they should have charged him or them with attempting to bring aliens into the United States. That's a crime. That's what they call it, attempting to bring aliens into the United States. That's a different crime. They didn't charge these people with that, for whatever reason. This is what they chose to do, encourage or induce, and there's simply no evidence of any of that.

Lopez's closing argument makes clear that even without the district court's supplemental jury instruction containing "to help," he argued to the jury precisely

25

what he now argues should have prevented his conviction – that the act of piloting a boat full of aliens was only attempting to bring the aliens to the United States, which was another crime and was not a violation of subsection 1324(a)(1)(A)(iv). Since Lopez presented essentially the same argument before the district court's supplemental instruction as he makes now, we cannot say the supplemental instruction prejudiced his defense.[15]

**D.    Supplemental Jury Instruction on Temporal Requirement in 8 U.S.C. § 1327**

Lopez next argues that the district court erred in instructing the jury that there is no temporal requirement in § 1327, which required proof that Lopez knew that the alien was inadmissible in the United States.  Specifically, Lopez contends that § 1327's intent element requires that a defendant know that the alien was inadmissible <u>at the time he boarded the boat</u>.  Lopez also claims that the absence of an express temporal requirement renders the statute ambiguous such that the rule of lenity should apply.

Section 1327 provides:

---

[15]We also reject Lopez's argument that the district court's supplemental instruction constructively amended the indictment.  Because the district court's supplemental jury instruction did not misstate the definition of "encourage," the supplemental instruction did not modify the elements of the offense charged as to in effect charge Lopez with a different crime. See United States v. Edwards, 526 F.3d 747, 760 (11th Cir. 2008) ("A constructive amendment occurs when the essential elements of the offense are altered to broaden the possible bases for conviction beyond what is contained in the indictment.") (citations omitted); United States v. Behety, 32 F.3d 503, 508-09 (11th Cir. 1994).

> Any person who knowingly aids or assists any alien inadmissible under section 1182(a)(2) (insofar as an alien inadmissible under such section has been convicted of an aggravated felony) or 1182(a)(3) (other than subparagraph (E) thereof) of this title to enter the United States, or who connives or conspires with any person or persons to allow, procure, or permit any such alien to enter the United States, shall be fined under Title 18, or imprisoned not more than 10 years, or both.

8 U.S.C. § 1327. The district court originally instructed that "[t]he defendant's knowledge of an alien's prior felony conviction is not an element of 8 U.S. Code § 1327. The Government need only prove that the defendant knew that the alien he aided or assisted was inadmissible to the United States." During deliberations, the jury asked if the knowledge requirement meant that the defendant had to know the alien was inadmissible in the United States at the time the alien boarded the boat outside of, or before it entered the United States. Lopez's counsel argued that the government had to prove Lopez knew at the time the aliens boarded the vessel that they were inadmissible. The district court rejected Lopez's counsel's argument and instructed the jury that § 1327 had no temporal requirement.

We first conclude that the district court properly instructed the jury that § 1327 did not require Lopez to know that the alien on board had a prior felony conviction but only that the alien he aided or assisted in entering the United States was inadmissible. United States v. Figueroa, 165 F.3d 111, 114 (2d Cir. 1998);

27

United States v. Flores-Garcia, 198 F.3d 1119, 1123 (9th Cir. 2000).  There is also no temporal requirement in § 1327.  Rather, § 1327 requires only that Lopez knew the alien he aided or assisted was inadmissible at some point before the alien sought to enter the United States.

The Second Circuit directly addressed the question of "how much a defendant must know in order to be convicted" under § 1327.  Figueroa, 165 F.3d at 114.  The Second Circuit noted that "§ 1327 does not indicate whether the word 'knowingly' was meant to modify only the verbs 'aid or assist' or some or all of the characteristics of the alien described in the statute."  Id.  After applying principles of statutory construction and inference of congressional intent, the Second Circuit concluded that "defendants can be found guilty under § 1327 provided they have sufficient knowledge to recognize that they have done something culpable."  Id. at 118.  The Second Circuit reasoned that knowledge that the alien was excludable "should put any reasonable person on notice that it would be illegal to aid that person's entry into the country."  Id.  Thus, the Second Circuit concluded "that a defendant can be convicted under § 1327 for aiding an alien who is excludable because of a prior aggravated felony conviction if the defendant knows only that the alien is excludable."  Id. at 119.

The Ninth Circuit followed the Second Circuit's conclusion in Figueroa that

28

"the defendant's knowledge of an alien's prior felony conviction is not an element of section 1327." Flores-Garcia, 198 F.3d at 1121. The Ninth Circuit concluded that "[t]he government need prove only that the defendant knew that the alien he was aiding or assisting was inadmissible to the United States." Id. at 1122. The Ninth Circuit explained that the rule of lenity did not apply because the statute's structure and its placement in the scheme of immigration law indicate that the defendant's knowledge of an alien's prior felony conviction is not an element of the offense. Id. at 1122.

Turning to this case, it is undisputed that Lopez knew at some point in the journey that his passengers were undocumented aliens seeking entry to the United States. Although the evidence did not show Lopez was aware that Pedro Valdez-Alvarado had a prior aggravated felony conviction, Lopez knew that Valdez-Alvarado was undocumented and sought illegal entry into the United States. The supplemental jury instruction correctly explained that there was no temporal requirement; Lopez's knowledge, regardless of when acquired, would suffice. See Figueroa, 165 F.3d at 119 ("[Section] 1327 thus places persons who would otherwise violate § 1324 at an increased risk if they happen to aid an alien who is excludable because of a conviction for an aggravated felony."). Accordingly, the district court's jury instruction regarding the lack of a temporal requirement in 8

U.S.C. § 1327 correctly stated the law and is not a basis for reversal.

## E. Prosecutor's Comments During Closing Arguments

Lopez contends that the prosecutor impermissibly asked the jury to draw an adverse inference from Lopez's assertion of his constitutional right to trial, by improperly suggesting that Lopez should have pled guilty like Carnet-Castro, Monge, and the aliens who had all "accepted responsibility" and "admitted their involvement." Lopez also claims that the prosecutor improperly vouched for its witnesses, warranting a new trial.[16]

The Sixth Amendment affords a criminal defendant the right to a speedy and public trial by an impartial jury. U.S. Const. amend. VI. Improper suggestions, insinuations, and assertions calculated to mislead or inflame the jury's passions are forbidden in the presentation of closing arguments. Rodriguez, 765 F.2d at 1560 (affirming conviction where the government commented on defendant's lack of patriotism). To establish prosecutorial misconduct:

> (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different. When the record contains sufficient independent evidence of guilt, any error is

---

[16]We review a claim of prosecutorial misconduct de novo because it is a mixed question of law and fact. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).

harmless.

Eckhardt, 466 F.3d at 947 (internal quotations and citations omitted).  This Court

has identified four factors to consider in determining whether a prosecutor's

conduct had a reasonable probability of changing the outcome of a trial:

> (1) the degree to which the challenged remarks have a
> tendency to mislead the jury and to prejudice the
> accused;
> (2) whether they are isolated or extensive;
> (3) whether they were deliberately or accidentally placed
> before the jury; and
> (4) the strength of the competent proof to establish the
> guilt of the accused.

Davis v. Zant, 36 F.3d 1538, 1546 (11th Cir. 1994).

Prosecutorial misconduct must be considered in the context of the entire

trial, along with any curative instruction.  United States v. Bailey, 123 F.3d 1381,

1400 (11th Cir. 1997).  "Because statements and arguments of counsel are not

evidence, improper statements can be rectified by the district court's instruction to

the jury that only the evidence in the case be considered."  United States v. Smith,

918 F.2d 1551, 1562 (11th Cir. 1990).  If the district court takes a curative

measure, we will reverse only if the evidence is so prejudicial as to be incurable by

that measure.  United States v. Trujillo, 146 F.3d 838, 845 (11th Cir. 1998).  We

presume that the jury followed the district court's curative instructions.  United

States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005).

A prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to evidence not admitted at trial. United States v. Chandler, 996 F.2d 1073, 1094 (11th Cir. 1993). To determine if the government improperly vouched for a witness, the court must decide whether a "jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility." United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983). This prohibition against vouching does not, however, forbid prosecutors from arguing credibility; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury. United States v. Eyster, 948 F.2d 1196, 1207 (11th Cir. 1991). "[We] ha[ve] recognized an exception to this prohibition, the so-called 'fair response' rule, that entitles a prosecutor to respond to arguments advanced by defense counsel in his or her statement to the jury." United States v. Smith, 700 F.2d 627, 634 (11th Cir. 1983).

Having reviewed the record and the parties' arguments and applying the above principles, we find no reversible error from the government's comments during closing argument.

During closing argument, Lopez's counsel challenged Carnet-Castro's credibility due to his prior felony conviction, his inconsistent statements to

government officials, and his plea agreement with the government, which provided an incentive for Carnet-Castro to testify favorably in order for a possible sentence reduction. Lopez's counsel argued that Lopez's version of events was truthful and that Carnet-Castro had not accepted responsibility for his actions and had lied extensively.

In rebuttal closing, the government sought to counter Lopez's counsel's contentions that Carnet-Castro did not accept responsibility for his actions and was not credible, and challenged the arguments that Lopez testified truthfully:

> Carnet-Castro has pled guilty. Carnet-Castro has accepted responsibility . . . .
> The only person in this case who has not accepted responsibility is the defendant –
> . . . .
> I submit to you everyone involved in this case has come clean and admitted their involvement. Even the poor people who were paying thousands of dollars to come into the United States.

Lopez's counsel objected to both statements and moved for mistrials; the district court sustained both objections, struck the government's statements, and denied the mistrial requests. In response to Lopez's second objection, the district court instructed the jury to disregard the prosecutor's last argument.

Examining the prosecutor's challenged comments in context, it is clear that she did not engage in reversible misconduct. Lopez's counsel had argued that

33

Lopez's version of events was truthful and that Carnet-Castro had not accepted responsibility for his actions and had lied extensively. The government was permitted to demonstrate not only that Carnet-Castro had accepted responsibility (by discussing his plea agreement), but also to call into question Lopez's credibility, which had been put at issue by his counsel. In any event, even if we were to assume the prosecutor's comments were improper, when examined in the context of the entire trial Lopez has not shown "a reasonable probability . . . that, but for the remarks, the outcome of the trial would have been different." Eckhardt, 466 F.3d at 947.

The district court also took adequate curative measures. It sustained Lopez's objections to the two prosecutor comments and struck them from the record. In addition, the district court explained that what the lawyers said was not evidence in the case three separate times during the trial – during the initial instructions at the beginning of trial, immediately before the parties gave their closing arguments, and during the jury instructions. The court also advised the jury that "every defendant is presumed by law to be innocent" and "[t]he law does not require a defendant to prove innocence or to produce any evidence at all." The court also instructed the jury that Lopez "ha[d] a right not to testify," but because he did, the jury "should decide in the same way as that of any other witness whether you believe the

34

defendant's testimony."

Further, the prosecutor's comments were not improper witness vouching. The prosecutor was permitted to comment on the credibility of her own witnesses without personally vouching for the witness's credibility or bolstering the witness's credibility through the government's reputation. The prosecutor properly referenced Carnet-Castro's guilty plea and acceptance of responsibility for his actions in the context of a larger discussion about the evidence and the credibility of the government's witnesses, as compared to Lopez's evidence and credibility. The record demonstrates that the prosecutor's challenged comments were a "fair response" to Lopez's counsel's attacks on the government and its witnesses.

Taken in context, these two comments were a minor portion of a lengthy trial in which there was substantial evidence against Lopez from multiple eyewitnesses, and we find no reversible error from the government's comments.

## F.    Cumulative Error

Lopez lastly argues his conviction must be reversed because the cumulative effects of the district court's erroneous supplemental instructions and the prosecutor's misconduct denied him a fair trial.

Even where individual judicial errors or prosecutorial misconduct may not be sufficient to warrant reversal alone, we may consider the cumulative effects of

35

errors to determine if the defendant has been denied a fair trial. United States v. McLain, 823 F.2d 1457, 1462 (11th Cir. 1987). "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997).

Having already determined that the district court did not err in instructing the jury with the two supplemental instructions and that the government's closing argument did not violate Lopez's Sixth Amendment rights, we also conclude, from our review of the trial as a whole, that the cumulative effects of those alleged errors did not deny Lopez a fair trial.

For all of these reasons, we affirm Lopez's convictions.

**AFFIRMED.**

BARKETT, Circuit Judge, concurring in part and dissenting in part:

While I concur with the majority that the district court did not err in instructing the jury that there is no temporal requirement in 8 U.S.C. § 1327, I dissent because I believe the district court's supplemental instruction on 8 U.S.C. § 1324(a)(1)(A)(iv) is <u>per se</u> reversible error. By defining "encourage" so generally to mean "help," the district court rendered at least one other statutory subsection superfluous and also constructively amended the indictment.

Jose Lopez drove the boat in which seventeen aliens were being smuggled into the United States. This conduct appears to violate another provision of the same statute, 8 U.S.C. § 1324(a)(2), which prohibits the knowing <u>transportation</u> of an alien who has not received prior official authorization to enter the United States. However, Lopez was not charged with violating this subsection. Rather, he was charged with violating § 1324(a)(1)(A)(iv), which prohibits the "<u>encouragement</u>" <u>or "inducement</u>" of an alien to come to the United States with the knowledge or reckless disregard of the fact that the alien's entry into the United States is in violation of the law.

The majority's decision eschews the ordinary and common sense meaning of the word "encourage" in favor of the most general and least meaningful possible interpretation, namely, "to help." The majority reasons that one form of "help" is

37

mere transportation. The majority's interpretation thus criminalizes not, as it suggests, two aspects of the same conduct but rather the same aspect of the same conduct. That is, if "encourage" as applied to bringing aliens into the United States subsection (a)(1) means "help" and "help" includes transportation, then subsection (a)(2) (transportation) must likewise means exactly the same thing as subsection (a)(1) ("encouraging" or "inducing"— or, in the majority's terms, "helping" an illegal entry). But surely "encouragement" or "inducement" under (a)(1) must criminalize something different than mere transportation, otherwise (a)(2) would be redundant. "A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." United States v. Canals-Jimenez, 943 F.2d 1284, 1287 (11th Cir. 1991).

Reading the statute as a whole — with "encouragement" or "inducement" in context — demonstrates that "encourage" must be read to mean something more than mere "help" in order to avoid rendering (a)(2) redundant.[1] See United States

---

[1] The majority's cited support for its position is not persuasive. See United States v. Ndiaye, 434 F.3d 1270 (11th Cir. 2006); United States v. Kuku, 129 F.3d 1435 (11th Cir. 1997). Ndiaye and Kuku did not present the possibility that those defendants, who were charged with "encouraging" aliens to reside or remain in the United States, could be convicted of the separate but uncharged crime of transporting an alien into the United States because those cases involved aliens who were already present in the United States. Further, United States v. Hanna is inapposite because while the defendant in Hanna drove the boat like Lopez, he also planned the smuggling and made preparations for the journey. 639 F.2d 192, 193 (5th Cir. Unit B 1980). In Hanna, the defendant was the captain of the boat; had been employed specifically to take the

38

v. Murrell, 368 F.3d 1283, 1287 (11th Cir. 2004) (disfavoring interpretation of "induce" as synonymous with "persuade" because to do otherwise would render other portions of the statute superfluous).  The majority's expansive interpretation of "encourage" most clearly renders subsection (a)(2) — transportation of an alien into the United States — superfluous but the problem applies more broadly as well.

The ordinary and common sense meaning of "encourage" implies an affirmative act that serves as a catalyst or trigger that drives, motivates, or spurs another individual to embark on a course of action that he might not have otherwise.  Indeed, dictionaries define "encourage" as "[t]o instigate; to incite to action; to give courage to; to inspirit; to embolden; to raise confidence; to make confident; to help; to forward; to advise."  Black's Law Dictionary 620 (4th ed. 1968); see also Black's Law Dictionary 568 (8th ed. 2004) (defining "encourage" as "[t]o instigate; to incite to action; to embolden; to help"); Webster's Third New Int'l Dictionary 747 (1993) (defining "encourage" as "to give courage to; inspire with courage, spirit, or hope; to spur on; to give help or patronage to.").  "Help" is the least preferred definition for "encourage."  It appears last (or towards the end of the list) and, unlike the more preferred meanings of "encourage," "help" is vague

---

boat to Miami; assisted the aliens in boarding the boat; left the boat in a smaller boat to go to an island to procure food and water for the aliens during the twelve-day boat trip from Haiti; instructed the aliens to use the alibi that he had concocted for them; and used that same alibi with the police. Id.

39

and provides the least descriptive context for the meaning of "encourage."

Applying the ordinary and most preferred meanings of "encourage" (i.e. not "help"), there is no evidence that Lopez incited the aliens to action or even spoke to or otherwise communicated with them prior to or during the voyage. He did not "encourage" or "induce" them to come. By no stretch of the facts did Lopez's mere act of driving the boat "instigate" or "incite to action" the passengers, who had already decided to illegally enter the United States before they met him and had undertaken the journey.[2] A taxi driver who takes a passenger to the address supplied by the passenger has engaged in different conduct than a taxi driver who approaches a potential passenger on the street and touts a specific tourist attraction urging the potential passenger to let the taxi driver take him there. In the former scenario, the taxi driver has merely transported the passenger. In the latter, the taxi driver has "encouraged" or "induced" that passenger to go to a specific destination.

---

[2] The majority relies heavily on Carnet-Castro's testimony that Lopez (1) had made a previous smuggling trip with him; (2) knew that this trip was a smuggling one; (3) intended to share the proceeds with Carnet-Castro; (4) drove the boat to the abandoned hotel where the aliens boarded; and (5) lied to Coast Guard officials when he was initially stopped. What is notable about the majority's characterization of the facts is that they do not address Lopez's interactions with the aliens themselves. When Lopez drove the boat to the abandoned hotel where the aliens boarded, the aliens had already formed their intent to board the boat and to enter the United States illegally. Lopez was not a catalyst for their intent to come to or enter the United States nor did his actions "incite to action" the aliens. Rather, their intention to enter the United States illegally was already formed prior to their embarkation, which itself was not brought about by Lopez's actions. Accordingly, Lopez's pilotage of the boat was nothing more than mere transportation of the aliens.

Under the facts of this case, the government chose the wrong statutory provision under which to prosecute Lopez and then attempted to cure this defect by broadening the basis of the indictment by defining "encourage" in a way that swallows the other subsections.[3] The majority tries to explain the government's mistake by asserting that when an act violates more than one criminal statute, the government may decide upon which statutory provision it will base its prosecution, and that the same conduct may violate more than one statutory provision. These legal principles are not in dispute. What I take issue with is that the majority's

---

[3] The government's failure to draft a comprehensive indictment or its failure to present evidence in support of the indicted charge cannot justify the constructive amendment of the indictment. This Court takes seriously the constitutional mandate that charges must be presented to a grand jury for an indictment to issue and that any conviction is based upon evidence supporting those charges only—and no others. This Court strictly construes charges contained in an indictment and holds both district courts and the government accountable for jury instructions and evidence that do not support the charged offense. See United States v. Narog, 372 F.3d 1243, 1248-50 (11th Cir. 2004) (holding that district court's supplemental jury instruction that the government need only prove that the defendant knew he was manufacturing a controlled substance constructively amended the indictment because indictment charged that defendant knew he was manufacturing methamphetamine and government's evidence supported methamphetamine production only).

As the Supreme Court has emphasized, after an indictment has been returned, its charges may be broadened only by the grand jury itself. Stirone v. United States, 361 U.S. 212, 215-16 (1960). This is because

> if it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed.

> Ex parte Bain, 121 U.S. 1, 10 (1887).

interpretation of the statute, when applied in the context of transportation, renders two statutory provisions coterminous. The majority's adoption of "help" as a definition of "encourage" is problematic for any of the subsections that have transportation as an element. This is because mere transportation is a form of "help" (as are many types of conduct given the broad-based meaning of the word "help") which the majority now claims is synonymous with "encouragement." But as I stated earlier, encouragement must mean more than mere transportation.

However, the government's error does not change the fact that the undisputed evidence is that Lopez followed Carnet-Castro and Monge's directions regarding where to drive the boat. There is no evidence that Lopez ever approached or communicated with the aliens prior to or even during the voyage. The jury recognized the inherent and critical difference between encouragement or inducement and mere transportation when it sent its note to the district judge, asking whether Lopez had to communicate with the aliens either "orally or by gesture" in order to be convicted of "encouraging" or "inducing" them.[4] To give

_____

[4] The majority's reliance on United States v. He, 245 F.3d 954 (7th Cir. 2001) is misplaced as He is distinguishable in several material respects. Most importantly for our purposes, the continuing viability of He is questionable in light of the Supreme Court's recent decision in Santos. The Seventh Circuit decided He seven years prior to the Supreme Court's decision in Santos and thus the Seventh Circuit's analysis, which focuses almost exclusively on the dictionary definitions to the exclusion of any holistic analysis of the statute, is lacking under the prescribed method of interpretation that now is binding on it and this Circuit. Second, as a decision of our sister circuit, He is not binding on this Court and is, at best, persuasive. Third, in He, the argument that the supplemental instruction provided an improper definition of

42

the supplemental instruction defining "encourage" as "help" in response was

erroneous.

<hr />

"encourage" as it renders other statutory provisions redundant was not advanced before the district court or the Seventh Circuit. 245 F.3d at 959. By contrast, in this case, it was vigorously argued by defense counsel before the district court and before this Court. Thus, the precise question before this Court was never before the Seventh Circuit and, as such, the resolution of it did not form the basis for the He decision. More to the point, the jury in He explicitly requested a "better definition" of the undefined statutory terms, 245 F.3d at 957, while in Lopez's case, the jury did not request any definition of the undefined statutory term. Finally, the defendant in He also provided much more than mere transportation while Lopez was merely the pilot of the boat in this case.