[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10762
Non-Argument Calendar

_____

D.C. Docket No. 1:18-cr-20584-JEM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICKY FERNETUS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 16, 2020)

Before WILSON, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

Ricky Fernetus appeals his convictions and 61-month prison sentence for possession of 15 or more unauthorized access devices and aggravated identity theft, raising various issues related to his jury trial and sentencing. We find no reversible error, and therefore affirm.

I.

In late February 2018, Fernetus lived with his girlfriend, Juanita Rose, in her three-bedroom apartment in Miami-Dade County. Surmondrea McGregor, who later became Fernetus's codefendant, also lived in the apartment. McGregor was on probation for a state crime.

McGregor's probation officer showed up early one morning for a scheduled visit. According to the probation officer, the apartment reeked of marijuana. After speaking briefly with McGregor, she decided to conduct a "probation search" of the apartment. She contacted law enforcement to assist her in securing the apartment and in case her search turned up contraband.

A few hours later, the probation officer returned with Miami-Dade police. Police conducted a safety sweep of the apartment and escorted all of the occupants, including Fernetus, outside. The probation officer found marijuana in one of the bedrooms and alerted the police officers, who began filling out an application for a search warrant. What happened next is disputed; Fernetus testified that the police kept him in handcuffs on the front landing for several hours while they ransacked

the apartment (without waiting for the search warrant). The police officers testified that they waited outside while the probation officer searched the apartment and obtained a search warrant before conducting their own search.

During their search, officers found lists of names, birth dates, Social Security numbers, driver's license numbers, and other personal identification information (PII), some on loose sheets of paper and more in a notebook or ledger. They also found several credit and debit cards issued to people who did not live in the apartment, and a pistol with an unusual clear extended magazine. According to one of the officers, he showed Fernetus a picture of some of the PII and credit cards—after reading Fernetus his *Miranda* rights—and Fernetus admitted that the cards and papers were his. Later, police discovered Fernetus's fingerprints on the ledger and on one of the loose pages of PII.

A grand jury returned an indictment charging Fernetus and McGregor with one count each of possessing 15 or more unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3) and three counts each of aggravated identify theft in violation of 18 U.S.C. § 1028A(a)(1). The grand jury also indicted McGregor for possession of a firearm by a convicted felon.

The district court arraigned Fernetus and issued an order setting the trial date and pretrial schedule. In its scheduling order, the district court ordered the parties to submit any motions in limine in writing no later than one day before the trial

3

calendar call, which was eventually scheduled for October 24, 2018. The court's pretrial order also stated that the failure "to comply with this or any Order of this Court, the Local Rules, or any other applicable rule SHALL result in sanctions or other appropriate actions."

Before the deadline for motions in limine, McGregor filed a motion to suppress evidence discovered during the search of the apartment. He acknowledged that his probationary status meant that the probation officer could enter and search his residence without a warrant if she had reasonable suspicion of criminal activity, but he contended that the government had not met its burden of showing that reasonable suspicion existed. At a status conference in McGregor's case, the court scheduled an evidentiary hearing on McGregor's motion and asked counsel for McGregor and the government to inform Fernetus's counsel that if he wished to file a motion to suppress, he should do so in time to participate in the hearing.

At the evidentiary hearing on McGregor's motion, counsel for McGregor and the government informed the magistrate judge that they had each contacted Fernetus's counsel as requested, and Fernetus's counsel said that he would file a motion and attend the evidentiary hearing on Fernetus's behalf. But Fernetus's counsel did not file a motion, did not attend the evidentiary hearing, and could not

4

be reached when the magistrate judge attempted to contact him. So the hearing proceeded without Fernetus's participation.

More than six weeks later, on October 29, 2018—five days after the calendar call and six days after the deadline to file motions in limine—Fernetus filed a motion to suppress evidence arising from the search of his girlfriend's apartment, including statements that he made to police while he was detained for the search. The government moved to strike or deny the motion, pointing out that it was filed after the court's deadline for motions in limine and after the deadline set by local court rules for motions in criminal cases. The district court granted the government's motion and denied Fernetus's motion to suppress as untimely.[1]

Just before trial, McGregor entered a guilty plea to the charge of possession of a firearm by a convicted felon. Fernetus moved to sever his trial from McGregor's, arguing that McGregor's plea to the firearm charge would likely result in the exclusion of evidence that (1) McGregor was on probation, and it was the probation officer's visit that led to the search of the apartment; and (2) the firearm that McGregor was charged with possessing was found in a closet of the apartment, where police also found one of the sheets of paper with PII. Fernetus argued that the exclusion of this evidence would hamper his defense, which was that McGregor was responsible for all the stolen PII in the apartment. The district

---

[1] The court denied McGregor's motion to suppress on the merits.

5

court denied Fernetus's motion to sever, and the defendants proceeded together through jury selection and trial.

After the parties selected 12 jurors and 2 alternates, Fernetus, who is Haitian American, objected to the jury panel because only one of the jurors was black. The court found that the 50-person jury venire from which the panel was drawn fairly represented the community and rejected Fernetus's challenge. The jury was sworn in and the parties continued to trial.

At trial, among other witnesses, the government presented the testimony of Miami-Dade police detective Jonathan Ortiz. Detective Ortiz testified that he participated in the search of the apartment. He described that police found a firearm with a clear extended magazine and a sheet of paper containing PII in a closet near the kitchen, and they found a notebook containing PII, several more loose sheets of paper with PII, and credit and debit cards bearing names of people who did not live in the apartment in the master bedroom. In the same bedroom, they also found documents with the name Ricky Fernetus and mail addressed to McGregor.

Detective Ortiz also testified that after he decided to arrest Fernetus and read him his *Miranda* rights, he showed Fernetus a photograph of some of the credit cards and loose sheets of PII found in the master bedroom, and Fernetus admitted that they were his.

6

Fernetus testified on his own behalf at trial, giving a different account of events than Detective Ortiz. As relevant to his appeal, Fernetus denied that any of the stolen identification information belonged to him, and he denied admitting ownership of the PII to Detective Ortiz. He testified that a different police officer (not Detective Ortiz) showed him a photograph of a single credit card bearing the downstairs neighbor's name, and Fernetus said that the card belonged to a neighbor. He also testified that he had seen the notebook with PII in different places around the apartment, and that he had probably handled it when cleaning the apartment.

The jury found Fernetus guilty as charged. The district court calculated a Sentencing Guidelines range of 37–46 months' imprisonment for possessing unauthorized access devices (Count 6 of the indictment) and a consecutive term of at least 24 months for three counts of aggravated identity theft (Counts 7–9). The court imposed a total sentence of 61 months' imprisonment, consisting of 37 months on Count 6 and 24 months consecutive on Counts 7–9.

Fernetus now appeals his convictions and sentence, alleging error at almost every stage of the proceedings below. He argues that the district court erred in (1) denying his motion to suppress, (2) denying his motion to sever his trial from McGregor's, (3) overruling his objection to the racial composition of the jury, (4) denying his motion for a mistrial based on portions of the government's closing

argument, and (5) applying an enhancement for obstruction of justice when calculating his sentencing range under the Sentencing Guidelines. We consider each argument in turn.

## II.

## A.

We turn first to the district court's denial of Fernetus's motion to suppress. Because the court denied Fernetus's motion on timeliness grounds, we review the ruling only for an abuse of discretion. *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990). "A district court abuses its discretion when it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *United States v. McLean*, 802 F.3d 1228, 1233 (11th Cir. 2015) (citation and quotation marks omitted).

Fernetus contends that his motion to suppress should have been deemed timely under Rule 12(b) of the Federal Rules of Criminal Procedure, which only requires such motions to be filed before trial, unless a different deadline is set by the court. He argues that the district court's scheduling-order deadline for motions in limine did not apply to his motion because a motion to suppress is not a motion in limine. And he argues that he could not have been required to file his motion

before the hearing on McGregor's motion to suppress, despite the court's request that he do so, because the court never issued an order to that effect.

We are not persuaded. Rule 12 allows district courts to set a deadline for pretrial motions and provides that any motion to suppress not filed by such deadline is untimely. Fed. R. Crim. P. 12(c). The district court here issued an order requiring all "motions in limine" to be filed one day before calendar call, or by October 23, 2018. The term "motion in limine" generally refers to a motion "to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *see also Motion in Limine, Black's Law Dictionary* (10th ed. 2014) (defining "motion in limine" as a "pretrial request that certain inadmissible evidence not be referred to or offered at trial"). The district court reasonably interpreted its own use of that term as encompassing all pretrial motions to exclude evidence, including motions to suppress evidence on constitutional grounds.

In any event, even if we were to accept Fernetus's argument that the district court's deadline for motions in limine did not apply to his motion to suppress, his motion was still untimely. Southern District of Florida Local Rule 88.9 requires motions in criminal cases to be filed within 28 days of the defendant's arraignment. Fernetus was arraigned on August 28, 2018, so any motion not encompassed by the court's scheduling order should have been filed by September

9

25, 2018. Under the local rule, Fernetus's motion to suppress was more than a month late. The district court did not abuse its discretion by denying Fernetus's motion as untimely because the motion was untimely.[2]

Furthermore, Fernetus did not show good cause for his failure to file his motion to suppress on time. *See* Fed. R. Crim. P. 12(c)(3) (providing that a district court may consider an untimely motion if the movant shows good cause). He stated in his motion for reconsideration that some of the same witnesses who testified at the federal evidentiary hearing on McGregor's motion testified at an earlier hearing in state court, and he wished to make the transcript of the state-court hearing available to the district court for consideration in connection with his motion. He asserted that he had filed his motion to suppress "[w]ithin days of that transcript being available." This statement was insufficient to establish good cause for the delay in filing his motion to suppress. Fernetus gave no reason why he could not have ordered a transcript of the state court proceedings, which took place on March 1, 2018, sooner. Nor did he explain why the state-court testimony that he attached to his untimely motion—that is, his own testimony, the testimony of Malek Barr (one of the apartment occupants who also testified at the hearing on

---

[2] To the extent that Fernetus may contend that his trial counsel was ineffective for failing to file a timely motion to suppress or attend the hearing on McGregor's motion, we generally do not consider such claims on direct appeal where the district court did not entertain the claim or develop a factual record. *United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010).

McGregor's motion), and the testimony of one of the Miami-Dade police officers—could not have been elicited at an evidentiary hearing in federal court.[3] Fernetus had all the information necessary to file his motion to suppress before the court's deadline, and he failed to do so.  The district court acted within its discretion in denying his motion on timeliness grounds, and we will not consider the merits of his motion to suppress at this stage.  *See United States v. Lall*, 607 F.3d 1277, 1288 (11th Cir. 2010).

B.

Fernetus also argues that the district court should have granted his motion to sever his trial from McGregor's because their defenses—in which each blamed the other for possession of the PII—were mutually antagonistic.  Fernetus claims that he was prejudiced by the denial of his motion because once McGregor pleaded guilty to the firearm charge, Fernetus was prohibited from introducing evidence that McGregor was on probation and that the search of the apartment arose from a visit by McGregor's probation officer.  He also argues that he was prejudiced by the "spill-over effect" of evidence admitted against McGregor.

We review a district court's decision on a motion to sever for an abuse of discretion.  *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007).

---

[3] Fernetus implied that the witnesses testified inconsistently at the state and federal hearings, but he has not pointed to any specific inconsistencies in their testimony, much less explained how any such inconsistencies might be material.

Federal Rule of Criminal Procedure 14 permits—but does not require—district courts to sever the trials of codefendants if trying the defendants together would prejudice either of them. Fed. R. Crim. P. 14(a); *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). The federal system has a preference for trying defendants who were indicted together jointly, however, because joint trials promote efficiency and help avoid inconsistent verdicts. *Zafiro*, 506 U.S. at 537.

The fact that the defendants' defenses are mutually antagonistic does not automatically demonstrate prejudice warranting severance. *Id.* at 538. It "is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540. Accordingly, a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Id.* at 539.

Fernetus has not shown either circumstance here. He has not pointed to any specific trial right that was endangered by the joint trial. Nor has he shown that he was prejudiced by evidence that was admitted against McGregor that would not have been admissible if his trial had been severed. The evidence against Fernetus included the incriminating evidence found in the bedroom of Fernetus's apartment along with documents bearing his name, testimony by a police officer that Fernetus

12

admitted to possessing some of the credit cards and PII found in the apartment, Fernetus's fingerprints found on multiple pages of the notebook and one of the loose pages of PII, and Fernetus's jail phone call stating that he was "stressed out" when he saw someone "come out with the book."  Evidence against McGregor included photographs from McGregor's social media account showing him with the gun with the clear magazine (which was found near some of the PII), large amounts of cash, debit cards and prepaid cards in the names of other people, and lists of PII; McGregor's fingerprints on pages of the PII; and Fernetus's testimony. The district court had no reason to expect that the jury would have any difficulty "sifting through" such evidence "to make an individualized determination as to each Defendant."  *United States v. Chavez*, 584 F.3d 1354, 1360–61 (11th Cir. 2009).  Furthermore, the district court avoided any potential prejudice by instructing the jury that it must consider each defendant and each offense, and the evidence pertaining to each offense, separately and individually.  *See United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997).  Under these circumstances, the district court did not abuse its discretion in denying Fernetus's motion to sever.

## C.

Fernetus also contends that the jury selection process resulted in a racially imbalanced jury, in violation of his rights under the Sixth and Fourteenth

13

Amendments.  We review his constitutional challenge to the jury selection process

de novo.  *United States v. Grisham*, 63 F.3d 1077, 1080 (11th Cir. 1995).

Fernetus argues that the jury that heard his case, consisting of 12 jurors and

one alternate, was not a jury of his peers because it included only one black juror.

He contends that the "Latin-heavy" jury panel did not reflect the racial makeup of

the Miami-Dade community, and that the district court should have continued to

interview jurors from the 50-person jury venire until the petit jury had "at least two

or three jurors of color."  He also contends that the jury selection process was

unfair and discriminatory toward African Americans because the 50-person venire

included only five or six black jurors and the government was allotted six

peremptory strikes—meaning that, if the government had chosen to use all of its

peremptory strikes on African Americans, it could have selected a jury with no

African American jurors.

Fernetus's constitutional challenge fails for (at least) two reasons.  *First*,

while the Sixth Amendment guarantees a criminal defendant the right to be tried by

a jury "drawn from a venire constituting a fair cross-section of the community,"

the fair-cross-section requirement does not mean that the petit jury actually chosen

"must mirror the community and reflect the various distinctive groups in the

population.  Defendants are not entitled to a jury of any particular composition."

*Holland v. Illinois*, 493 U.S. 474, 482–83 (1990).  And although Fernetus argues

14

that the government *could* have chosen to use its peremptory strikes in a racially discriminatory manner—which would have violated his Fourteenth Amendment equal protection rights—he does not contend that the prosecutor actually did so. To the contrary, of the jurors struck by peremptory challenge, only one was identified as African American—and that juror was struck by Fernetus and McGregor, not by the government.

*Second*, Fernetus has failed to show any constitutional violation in the selection or composition of the jury venire from which his petit jury was chosen. To establish a prima facie claim for a violation of the Sixth Amendment fair-cross-section requirement, a defendant must show that "(1) the allegedly excluded group is a 'distinctive group in the community'; (2) the representation of this group in the venire from which the jury was selected was not 'fair and reasonable in relation to the number of such persons in the community'; and (3) the under-representation was due to 'systematic exclusion of the group in the jury-selection process.'" *United States v. Clarke*, 562 F.3d 1158, 1163 (11th Cir. 2009) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  Similarly, to establish a prima facie violation of the Fourteenth Amendment's Equal Protection Clause, the defendant "must show (1) that he or she is a member of a group capable of being singled out for discriminatory treatment, (2) that members of this group were substantially underrepresented on the venire, and (3) that the venire was selected under a

15

practice providing an opportunity for discrimination." *Cunningham v. Zant*, 928 F.2d 1006, 1013 (11th Cir. 1991). Fernetus has not met the required showing on the second or third prong of either test.

For starters, Fernetus has not provided accurate information permitting a comparison between the percentage of African Americans in the relevant community and the number of African Americans in the jury venire. Accepting for the sake of argument Fernetus's unsupported assertion that the community was 18% African American, he has not shown that the percentage of African Americans in the venire was substantially lower than that figure. *See Grisham*, 63 F.3d at 1078–79 (holding that the defendant must show an absolute disparity of at least 10% to show that a group was not fairly represented in the venire). The transcript of the court's voir dire of the jury pool does not reflect the race of any of the prospective jurors, and Fernetus has not provided that information. When Fernetus initially raised a question of racial disparity in the jury pool, he had not even seen the venire and had no idea of its racial makeup. Fernetus renewed his objection after the petit jury was chosen but did not provide any information about the number of African Americans in the venire at that time either.

On appeal, Fernetus claims that the venire included only five or six African Americans. But this figure finds no support in the record. In ruling on Fernetus's motion, the district court stated that the venire had included "a substantial number"

16

of black jurors—"at least six or seven"—and that if the percentage of African American jurors in the venire did not exactly correlate to the 18% figure that Fernetus named, it came "pretty close." Fernetus did not contest those statements in the district court, and he provides no basis for challenging them now. Consequently, he cannot show that the percentage of African Americans in the jury venire was not "fair and reasonable in relation to the number of such persons in the community" for purposes of his Sixth Amendment challenge, or that African Americans were "were substantially underrepresented on the venire," for purposes of his equal protection challenge. *Clarke*, 562 F.3d at 1163; *Cunningham*, 928 F.2d at 1013.

Moreover, Fernetus has not even attempted to make the required showing on the third prong of either test—he has not contended that the process by which his jury venire was selected provided an opportunity for racial discrimination, much less that the venire-selection process involved the systematic exclusion of African Americans.[4] Accordingly, we reject Fernetus's constitutional challenges to the composition of the jury.

---

[4] According to the district court's Jury Plan, members of the jury venire were chosen by random selection from the list of registered voters in the court's Miami division. United States District Court for the Southern District of Florida, *Plan for the Random Selection of Grand and Petit Jurors* (May 5, 2010), available at https://www.flsd.uscourts.gov/sites/flsd/files/JuryPlan.pdf.

17

D.

During his closing argument, Fernetus's attorney questioned the credibility of Detective Ortiz, the police officer who testified that Fernetus had admitted to possessing some of the credit cards and stolen PII found in the apartment. Defense counsel argued that there was no corroboration for Detective Ortiz's testimony that he read Fernetus his *Miranda* rights and Fernetus admitted to possessing incriminating evidence. He argued that there were no corroborating witnesses, despite the presence of several other officers at the scene, and he questioned why Detective Ortiz had no body-camera video, signed *Miranda* form, or other evidence to corroborate his testimony.

In response, the government made the following statements during its rebuttal argument:

> And again, Detective Ortiz, his testimony is evidence, and he was unimpeached. He testified credibly. Everything he said was supported by the evidence, and you heard his testimony. You can judge his credibility for yourself. Did he impress you as someone who was telling the truth. Was his testimony supported by other evidence. Did he have a motive to lie. No, of course not. He's a sworn law enforcement officer. His job is to tell the truth, and on that stand he took an oath to tell the truth.

Fernetus contends that this argument constituted improper "bolstering" of Detective Ortiz's testimony, for which the district court should have granted his motion for a mistrial or given a curative instruction to the jury.

18

We generally review claims of prosecutorial misconduct during closing arguments de novo. *United States v. Sosa*, 777 F.3d 1279, 1294 (11th Cir. 2015). To constitute prosecutorial misconduct, remarks during closing arguments must: (1) be improper, and (2) prejudicially affect the substantial rights of the defendant. *United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir. 1998). A defendant's substantial rights are prejudiced when there is a reasonable probability that, but for the prosecutor's comments, the outcome of the trial would have been different. *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009).

"Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility." *Sosa*, 777 F.3d at 1295. Improper vouching occurs when the prosecutor (1) puts "the prestige of the government behind the witness" by explicitly personally assuring the jury of the witness's truthfulness, or (2) indicates that information not before the jury supports the witness's testimony. *United States v. Epps*, 613 F.3d 1093, 1100 (11th Cir. 2010). Importantly, the rule against bolstering does not prohibit the government from arguing that its witness was credible, so long as its argument is not "based on the reputation of the government office or on evidence not before the jury." *Lopez*, 590 F.3d at 1256; *see Sosa*, 777 F.3d at 1295. Moreover, there is an exception to the rule against bolstering, known as the "'fair response' rule," that permits the prosecutor to respond when the defense has attacked the credibility of a

19

government witness during its argument. *Lopez*, 590 F.3d at 1256 (citation omitted).

For the most part, the remarks that Fernetus objects to on appeal were permissible rebuttal argument, responding to Fernetus's attacks on Detective Ortiz's credibility by urging the jury to find the officer's testimony credible based on the factors that they had been instructed to consider for all witnesses, including his demeanor, apparent lack of motive to lie, and other evidence in the record. And while we have concerns about the propriety of the prosecutor's statement that it was the officer's job to tell the truth, we find no reversible error because there is no reasonable probability that the outcome of the trial would have been different if the prosecutor had not made the comment.

To begin, we find it highly unlikely that the prosecutor's questionable comment tipped the balance for the jury in deciding whether to credit Detective Ortiz's testimony and disbelieve Fernetus. During its preliminary instructions and again just before closing arguments, the court instructed the jury that it should base its verdict only on the evidence, and that any statements by the lawyers were not evidence. The court also instructed the jury that it would be the sole judge of the witnesses' credibility, and that it could accept or reject the testimony of any witness in whole or in part. The court instructed the jury that when deciding whether to believe a witness, it should consider the witness's relationship to the

20

government or the defendant, as well as the witness's demeanor, personal knowledge, fairness, and intelligence, and whether the witness's testimony was supported or contradicted by other evidence. The court also specifically instructed the jury that it should consider with caution and great care any evidence offered by the government that Fernetus made a statement or admission to someone after being arrested or detained. We generally expect that such instructions will have some curative effect if the prosecutor makes marginally improper comments regarding the testimony of one of its witnesses. *See id.* at 1257.

In addition, the evidence against Fernetus was strong enough that there is no reasonable likelihood that the jury would have reached a different verdict without the prosecutor's challenged remarks. The notebook full of PII was found in the master bedroom of the apartment where Fernetus lived, along with credit and debit cards in other people's names, loose sheets of paper with additional PII, and documents addressed to Fernetus. A fingerprint examiner testified that she examined the notebook of PII and found 19 of Fernetus's fingerprints inside the notebook on pages with lists of names, Social Security numbers, birth dates, and other identification information. And the government presented a recording of a phone call Fernetus made from jail, during which he said that he had "fu***d up" and that he "was stressed out" when he "seen him come out with the book," which

21

Detective Ortiz understood to be a reference to police coming out of the apartment carrying the notebook of PII.

In the context of the entire trial, therefore, we cannot say that there was any reasonable probability that the outcome of the trial would have been different if the prosecutor had not argued that it was Detective Ortiz's job as a police officer to tell the truth. Accordingly, even if the government's comment was improper, any error in permitting the statement was harmless. *See id.* at 1256.

E.

Last, Fernetus challenges his sentence on the ground that the district court improperly applied a two-level enhancement for obstruction of justice when calculating his Sentencing Guidelines range. We review the district court's factual findings supporting the enhancement for clear error and its application of the Guidelines to those facts de novo. *United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006). As to the factual findings, we must affirm the district court unless we are left "with the definite and firm conviction that a mistake has been committed." *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003) (citation omitted).

The district court increased Fernetus's Guidelines offense level based on U.S.S.G. § 3C1.1, which provides that an upward adjustment of two levels is appropriate where the defendant willfully obstructed or impeded, or attempted to

22

obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing. The commentary to § 3C1.1 provides that obstruction of justice includes, among other things, committing perjury. U.S.S.G. § 3C1.1 comment. (n.4(B)). For purposes of this enhancement, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

Here, the district court found that Fernetus committed perjury when he testified at trial that he had handled the notebook full of stolen PII on occasion when he was cleaning the apartment. The court found that Fernetus's testimony was false because it was intended to convince the jury that he had picked up the notebook only to move it while he was cleaning, rather than with the intent to use the information in the notebook to commit fraud.

Fernetus argued that the enhancement should not apply because he testified that he had touched the notebook and the fingerprint evidence showed that that testimony was true. He contends that the district court applied the enhancement only to punish him for testifying. We do not agree.

Fernetus testified that he had seen the notebook around the apartment and touched it "a couple of times." He testified, "Yeah, I probably placed it down

somewhere, moved it out of my way where I was cleaning, something like that."

The evidence that Fernetus's fingerprints were found throughout the notebook, on multiple pages where the stolen identification information appeared, contradicts his testimony that he touched the notebook "a couple of times," and is inconsistent with his testimony that he only moved the notebook around when he was cleaning. "A sentencing judge clearly has the authority to enhance a defendant's offense level if the judge makes an independent factual finding that the defendant willfully lied in trial testimony." *United States v. Husky*, 924 F.2d 223, 224 (11th Cir. 1991). The district court made such a finding here, and because the record supports that finding, we cannot say that it was clearly erroneous.

## III.

For the reasons discussed above, we affirm Fernetus's convictions and sentence.

**AFFIRMED**.

24