[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-14963

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LONNIE FAVORS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cr-60136-WPD-1

_____

Before NEWSOM, MARCUS, Circuit Judges, and LAWSON,⋆ District Judge.

PER CURIAM:

Lonnie Favors appeals his conviction and sentence for knowingly possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Favors argues that he is entitled to a new trial because the prosecutor engaged in misconduct during closing arguments. After review, and with the benefit of oral argument, we conclude that while some of the prosecutor's commentary was improper, none of the remarks affected Favors' substantial rights. Moreover, there was sufficient evidence of Favors' guilt to support the verdict; therefore, any error was harmless. We accordingly affirm Favors' conviction. However, we vacate Favors' 240-month sentence and remand for resentencing under *United States v. Carter*, 7 F.4th 1039 (11th Cir. 2021) and *United States v. Moss*, 920 F.3d 752 (11th Cir. 2019), *opinion reinstated in light of Borden v. United States*, 141 S. Ct. 1817 (2021), 4 F.4th 1292 (11th Cir. 2021) (en banc).

I.

On April 11, 2019, the Fort Lauderdale Police Department ("FLPD") received a 911 call reporting an armed subject asleep inside a white Jeep Wrangler parked at Broward Garden Apartments,

---

⋆ Honorable Hugh Lawson, Senior United States District Judge for the Middle District of Georgia, sitting by designation.

located at 2910 Northwest 19th Street in Fort Lauderdale, Florida. Major Dana Swisher, a 22-year veteran of the FLPD and the supervisor of the department's road patrol unit, and Officer Robert Norvis responded to the call. Typically, Major Swisher does not respond to 911 calls. Occasionally, though, he accompanies his subordinates to observe the impact of departmental policies. On the morning of April 11, Major Swisher was a passenger in Officer Norvis' patrol car.

Swisher, Norvis, and three other FLPD officers were dispatched to Broward Garden Apartments around 8:18 a.m. The officers arrived in marked patrol vehicles. For safety purposes, and to maintain the element of surprise, the officers did not activate their flashing lights or sirens. Each officer was wearing a patrol uniform. Major Swisher and Officer Norvis additionally wore bullet-proof vests.

All of the officers, with the exception of Major Swisher, were equipped with body-worn cameras in accordance with a recently enacted FLPD policy. Major Swisher testified that the department did not issue him a body-worn camera as the policy exempted any officer ranked above captain. Officer Norvis testified that FLPD issued him a body-worn camera on March 23, 2019. While he was wearing the camera on April 11, Norvis stated that the events leading to Favors' arrest happened so fast that he forgot to activate the camera. Only about three minutes passed between the time Major Swisher and Officer Norvis entered the apartment complex parking lot and the time they arrested Favors. FLPD policy required Officer

Norvis to e-mail his supervisor regarding any failure to turn on his camera. There is no evidence that Norvis sent an e-mail. Shortly after Favors' arrest, Norvis did, however, inform Major Swisher, who was in his chain of command, that he did not record the events.

As Major Swisher and Officer Norvis pulled into the south side of the apartment complex, they observed a white Jeep Wrangler backed into a parking space. There was a wrought-iron fence behind the Jeep and a U-Haul truck adjacent to the vehicle. The officers parked some distance from the Jeep and approached along the fence line with their service weapons drawn. The officers used the U-Haul truck as a shield as they neared the Jeep and looked for an occupant.

The officers observed a male subject reclined in the driver's seat. He appeared to be asleep. Major Swisher instructed Officer Norvis to move toward the driver's side door. Officer Norvis tried the door handle, but it was locked. Major Swisher then rounded the vehicle toward the front right quarter panel so that he could view the driver through the front windshield. From his position, Officer Norvis observed the butt of a firearm protruding from underneath the driver's side seat. When the suspect, whom the officers later identified as Favors, stretched his arms and sat up, the officers gave verbal commands for him to put his hands up and to unlock the driver's side door. Favors complied. The officers removed Favors from the vehicle and placed him in handcuffs. Major

Swisher testified that after Favors' arrest he saw the butt of the firearm beneath the driver's side seat.

Officer Norvis conducted a pat-down search of Favors. The search revealed two magazines fully loaded with nine-millimeter bullets in the front pocket of Favors' hooded sweatshirt. Officer Norvis photographed the gun located on the floorboard under the driver's seat with his tablet camera. He then removed the firearm from the vehicle. Norvis identified the gun as a Tauris nine-millimeter pistol. The gun was fully loaded with a round in the chamber.

Senior Special Agent Joshua Murr with the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") examined the firearm and ammunition seized during Favors' arrest. Agent Murr testified that the Taurus nine-millimeter pistol was manufactured in Brazil and imported to Miami, Florida by Taurus International, who then distributed the firearm to Georgia. The agent thus concluded that the firearm had traveled in interstate and foreign commerce. The agent further determined that the ammunition had been manufactured in Minnesota and traveled in interstate commerce. Finally, Agent Murr testified that the firearm was operational. The agent was not aware whether DNA or fingerprints were taken from the firearm. But, according to Agent Murr, it is rare to extract fingerprints from firearms because the solvents commonly used to clean firearms remove fingerprints.

Favors stipulated at trial that he was previously convicted of a felony offense. He also stipulated that at the time he possessed

the firearm and ammunition in this case, he knew that he had previously been convicted of a felony offense.

## A.

Favors argues that the government committed prosecutorial misconduct by making eight improper statements during closing arguments. Favors asserts those statements inflamed the jury's passions, interjected the prosecutor's personal experience to vouch for the credibility of the government's witnesses, and shifted the burden of proof from the government to the defense.

We review *de novo* claims of prosecutorial misconduct during closing arguments. *United Stated v. Sosa*, 777 F.3d 1279, 1294 (11th Cir. 2015). To establish prosecutorial misconduct, "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) (quotation marks omitted). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *Id.* "When the record contains sufficient independent evidence of guilt, any error is harmless." *Id.*

"Prosecutorial misconduct must be considered in the context of the entire trial, along with any curative instruction." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) (citing *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)). "Because statements and arguments of counsel are not evidence, improper

statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered." *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990). When the district court provides a curative instruction, "we will reverse only if the evidence is so prejudicial as to be incurable by that measure." *Lopez*, 590 F.3d at 1256.

1.

Favors argues that he is entitled to a new trial based on the prosecutor's repeated attempts to gain the jury's sympathy and to inflame the passions of the jury. Favors contends that the prosecutor's tactics were misleading and confusing. Prosecutors must refrain from improper tactics designed to produce a wrongful conviction. *Berger v. United States*, 295 U.S. 78, 88 (1935). The only purpose of closing arguments is for the prosecutor to help the jury evaluate the evidence. *United States v. Rodriguez*, 765 F.2d 1546, 1559 (11th Cir. 1985). "A prosecutor is . . . forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury and may not appeal to the jury's passion or prejudice." *Id.* at 1559-60 (quotation marks and citation omitted).

According to Favors, the prosecutor endeavored to garner the jury's sympathy by drawing a comparison between the officers responding to the 911 call and members of the armed forces:

> Think about this, ladies and gentlemen. There's been criticism of the police and how they did their job, but other than the military, can you think of any other profession where you leave your house—if you're

married, you leave your wife. If you're a father, you leave your children. If you're a mother . . .

Defense counsel objected to the prosecutor's remark before he finished his sentence, arguing that the prosecutor was asserting an improper argument and inflaming the passions of the jury. The district court sustained the objection. The prosecutor moved on with his argument. He went on to say that the officers wore bullet-proof vests for a reason. Defense counsel twice objected to this remark. The district court overruled the objection.

Favors argues that the prosecutor's comments were strategically designed to draw on the jury's sympathies for members of the military, who risk their lives in defense of others. But defense counsel's well-timed objection makes it uncertain what conclusion the prosecutor intended to draw. Even if the prosecutor had completed his statement in the way presupposed by Favors, we do not find the remark inflammatory. It is commonly understood that law enforcement officers face certain dangers in the line of duty. Moreover, it is evident from the context of the evidence presented during the trial of this case that the officers faced dangerous circumstances. The officers testified that the 911 dispatcher alerted them to a potentially armed suspect. Thus, while the prosecutor's comments did not necessarily assist the jury in evaluating the evidence, it was not misleading for the prosecutor to comment that the officers' job was inherently dangerous or that donning bulletproof vests was a legitimate use of the officers' available resources.

The most questionable conduct highlighted by Favors came during the prosecutor's rebuttal argument. The prosecutor compared the evidence to a jigsaw puzzle, remarking,

> Ladies and gentlemen, when you take the 37 pieces of evidence that [Favors'] charged with, the gun, the 36 bullets, and you put all the pieces together, this is how the puzzle looks . . . and this is why he's guilty.

The prosecutor then published a photograph displaying the firearm, magazines, and ammunition seized from Favors arranged to spell out "GUILTY!" Defense counsel promptly objected to the photograph as improper, unethical, and inflaming the passions of the jury. The district court sustained the objection. The prosecutor concluded his argument by stating, "[w]hen you put all the evidence together"—the firearm, magazines, and ammunition—"the picture is clear. The defendant's guilty, and that's the verdict we ask you to return."

Defense counsel moved for a mistrial based on the photograph published to the jury during the government's closing remarks. The district court questioned defense counsel, "Why couldn't [the prosecutor] have taken a piece of paper and write guilty on it and say, that's what I think your verdict should be?" The district court agreed that the photograph was improper but determined that a mistrial was not warranted. The court opined that "it's demeaning to this jury's intelligence to think that artfully setting out the word 'guilty,' using bullets and a gun, is going to somehow cause them to come back with a guilty verdict when it

wasn't otherwise justified." The district court ultimately denied the motion for mistrial.

The government conceded during oral argument that the photograph was inappropriate. We agree. There was no conceivable purpose for fashioning the evidence into the word "GUILTY!" other than for potential shock value. Nevertheless, we conclude that the prosecutor's conduct did not prejudicially affect Favors' substantial rights when viewed in the context of the entire trial. The government introduced the firearm, magazines, and ammunition during trial, evidence which the government's witnesses described and discussed in detail. Simply arranging the evidence to spell out the verdict the government hoped the jury would return therefore was unlikely to mislead or improperly influence the jury's deliberations.

2.

Favors next contends that the prosecutor impermissibly interjected his personal experience as a prosecutor to reinforce the credibility of the government's witnesses and to undermine Favors' defense. "Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1313 (11th Cir. 2010). Bolstering occurs when a jury "could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility." *United States v. Knowles*, 66 F.3d 1146, 1161 (11th Cir. 1995) (quotation marks and citation omitted).

During the trial, defense counsel thoroughly cross-examined Major Swisher and Officer Norvis about the absence of body-worn camera footage depicting their initial approach, observation of the firearm under the driver's side seat, and arrest of Favors. Swisher testified that since he had a rank above captain, the FLPD policy did not require him to wear a body-worn camera. Norvis testified that the department issued him a body-worn camera a few weeks before Favors' arrest. Unfortunately, he failed to activate his camera. The evidence demonstrated that only about three minutes passed between the time the two officers entered the apartment complex and when they arrested Favors, lending credibility to Norvis' testimony that events unfolded so quickly he forgot to turn on his camera.

In his closing remarks, the prosecutor made the point that the absence of body-worn camera footage did not diminish the strength of the other evidence presented of Favors' guilt. The prosecutor showed the jury his tie, where he affixed a body-worn camera loaned to him by the FLPD, stating, "But guess what, ladies and gentlemen, I forgot to turn it on. So . . . does that mean that everything I just told you wasn't said?" He continued,

> Ladies and gentlemen, I've been a prosecutor for many, many, many, many years, 32 in federal court. These things are relatively new. Ladies and gentlemen, there have been people convicted for years before these body cameras were invented, without body-camera video.

The district court overruled defense counsel's objection that this comment was improper argument. The prosecutor went on to describe historical events, such as the assignation of Abraham Lincoln by John Wilkes Booth, which we know to be factual but which was not captured by a video recording, to support his conclusion that video footage was not necessary to prove guilt.

Favors argues that the prosecutor improperly portrayed himself as an expert and called on his experience as a federal prosecutor to undermine Favors' defense. To the contrary. The prosecutor's objective was to inform the jury that the absence of body-camera footage alone did not mandate an acquittal. Rather, as the prosecutor explained, and the district court later re-stated in the jury charges, the jury's job is to evaluate the strengths and weaknesses of the evidence, to determine the credibility of the witnesses, and to review all the evidence. In context, the prosecutor's statements were not improper.

Favors claims that the prosecutor improperly drew on his experience again during his rebuttal argument. Defense counsel argued in closing that law enforcement officers staged the position of the firearm in the automobile prior to photographing the weapon. The prosecutor countered in his rebuttal that the gun was not staged; rather Officer Norvis photographed the gun from two different angles. He directed the jury to examine the knobs and divots of the firearm along with the position of the seat. He then stated:

> And that is his entire defense, ladies and gentlemen.
> Because I've done prosecution for 35 years, three in

> state, 32 in federal, and there's something I've learned listening to all these closing arguments. What is not said by the defense attorney is as important as what is said.

Defense counsel objected to the statement as improper burden shifting. The district court instructed the jury that the burden of proof lay with the government and invited the prosecutor to continue with his argument.

On appeal, Favors argues not that the prosecutor was engaging in burden shifting but that he again was invoking his personal expertise to explain the evidence. To the extent that the prosecutor in any way expressed a personal view about how the jury should view the evidence, the prosecutor's statement was improper. But Favors has not shown how this particular reference to the prosecutor's years of experience prejudicially impacted his substantial rights.

The same is true of the prosecutor's comment, "I'm here to tell you, [the gun] was here, in arm's reach of the defendant, Lonnie Favors." Defense counsel objected to this statement as a "misstatement of the argument" and a "denigration of the defense." The district court gave this curative instruction: "The jury will rely on their own recollection of what the testimony was. What the lawyers say isn't evidence." The court's instruction cured any potential prejudice to Favors. *See Lopez*, 590 F.3d at 1256.

3.

Favors' final argument in support of his quest for a new trial is that the prosecutor improperly attempted to shift the burden of proof onto the defense. "[P]rosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). A prosecutor may, however, comment "on the failure by defense counsel, as opposed to the defendant, to counter or explain evidence." *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998).

The prosecutor posed several rhetorical questions to the jury concerning the gun found in Favors' locked vehicle during his closing and rebuttal arguments. Favors characterizes these questions as impermissible burden shifting. The prosecutor asked,

> Who else could have put it there? Who else have you heard could have put it there? And why do we know that he put it there?

Defense counsel objected to these questions as improper burden shifting. The district court overruled the objection.

The prosecutor later asked,

> Now, ladies and gentlemen, maybe the evil tooth fairy possibly fluttered into the passenger compartment and put the gun there? We don't have any proof of that.

Defense counsel again objected to improper burden shifting. The district court responded by reminding the jury that the burden of proving Favors' guilt was on the government, not the defense.

It is evident that the purpose of the prosecutor's remarks was not to suggest that Favors had an obligation to prove that someone else placed the gun in the vehicle. Rather, the prosecutor was commenting on the defense's failure to counter or explain the government's evidence that a gun was found in a locked car where Favors was sleeping. *See Knowles*, 66 F.3d at 1163 ("It is not error to comment on the failure of the defense as opposed to the defendant, to counter or explain the evidence.") (quotation marks omitted). And, even if the prosecutor's argument could be viewed as burden shifting, the district court provided a sufficient curative instruction such that Favors' substantial rights were not prejudiced.

★★★

The prosecutor in this case pushed the boundaries of propriety during his closing arguments. But when viewed in the context of the trial as a whole, even the most problematic of the prosecutor's conduct did not prejudicially affect Favor's substantial rights. The district court adequately addressed any improper conduct through its curative instructions and the general charges to the jury, reminding the jury that the burden of proving Favors' guilt lay with the government, that the comments of the attorneys were not evidence, and that it was the duty of the jury to weigh the evidence and to evaluate the credibility of the witnesses prior to reaching a verdict. Moreover, the record contains sufficient evidence independent of the prosecutor's concluding arguments to support a finding of Favors' guilt. Accordingly, any error was harmless. *See Eckhardt*, 466 F.3d at 947.

B.

The district court sentenced Favors to 240-months imprisonment. The sentence was based, in part, on a finding that two prior convictions for making terroristic threats under Georgia law and three convictions for aggravated assault under Georgia law qualified Favors as an armed career criminal under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1).[1] The parties agree under *United States v. Carter*, 7 F.4th 1039 (11th Cir. 2021) and *United States v. Moss*, 920 F.3d 752 (11th Cir. 2019), *opinion reinstated in light of Borden v. United States*, 141 S. Ct. 1817 (2021), 4 F.4th 1292 (11th Cir. 2021) (en banc), that Favors' three

---

[1] Favors argues on appeal that under *United States v. Oliver (Oliver I)*, his two Georgia convictions for making terroristic threats do not qualify as violent felonies under the ACCA. In their response brief, the government conceded this position based on our decision in *United States v. Oliver, (Oliver II)*, 955 F.3d 887 (11th Cir. 2020). Since briefing in this case ended, however, we vacated and superseded our decision in *Oliver II* in *United States v. Oliver (Oliver III)*, 962 F.3d 1311, 1314 (11th Cir. 2020).

The Georgia terroristic threats statute under which Favors was convicted makes it unlawful to "threaten[ ] to commit any crime of violence, to release any hazardous substance, . . . or to burn or damage property with the purpose of terrorizing another." O.C.G.A. § 16-11-37(a). In *Oliver III*, we held this statute divisible under *Mathis v. United States*, 136 S.Ct. 2243, 2249 (2016) and concluded that "to threaten to commit any crime of violence" necessarily "requires the threatened use of violent force against another" and, therefore, qualifies as a predicate offense under the ACCA. 962 F.3d at 1320-21. The record here indicates that Favors was convicted of making terroristic threats to commit murder. His convictions under O.C.G.A. § 16-11-37(a) consequently qualify as violent felonies under the ACCA.

19-14963          Opinion of the Court            17

convictions under O.C.G.A. § 16-5-21 do not qualify as violent felonies under the ACCA.

Favors pleaded guilty to and was convicted of aggravated assault under O.C.G.A. § 16-5-21 in 2009, 2016, and 2018. However, the record does not indicate whether Favors' aggravated assault convictions were premised on O.C.G.A. § 16-5-20(a)(1), attempting to commit a violent injury, or O.C.G.A. § 16-5-20(a)(2), placing another in reasonable apprehension of immediately receiving a violent injury. We therefore must assume that the conviction was based on the least of the acts criminalized by the simple assault statute, placing another in reasonable apprehension of receiving a violent injury. *See Moss*, 920 F.3d at 758.

The ACCA mandates a minimum sentence of 15 years' imprisonment for any defendant convicted of being a felon in possession of a firearm who has three or more previous convictions "for a violent felony or a serious drug offense . . . committed on occasions different from one another." 18 U.S.C. § 924(e)(1). The ACCA defines "violent felony" as any crime punishable by a term of imprisonment exceeding one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). The Supreme Court held in *Borden* that the phrase "use . . . against the person of another" in the ACCA's elements clause "sets out a *mens rea* requirement—of purposeful or knowing conduct." *Borden*, 141 S. Ct. at 1828, 1829 n.6 (plurality opinion). A crime that can be committed with a *mens rea* of mere recklessness cannot qualify as a crime of

violence under the elements clause. *Id.* at 1834. In *Moss*, we therefore held, "[b]ecause Georgia's aggravated assault statute, O.C.G.A. § 16-5-21(a)(2) . . . can be satisfied by a [*mens rea*] of recklessness when based on simple assault under § 16-5-20(a)(2), it cannot qualify as a crime of violence under the elements clause of the ACCA." *Moss*, 920 F.3d at 759.

Having concluded that Favors' three prior convictions for aggravated assault with a deadly weapon were based on simple assault under O.C.G.A. § 16-5-20(a)(2), a crime that can be accomplished with a *mens rea* of recklessness, we find that the convictions do not qualify as violent felonies under the ACCA's elements clause. We accordingly vacate Favors' sentence and remand for resentencing.

II.

For the reasons stated above, we affirm Favor's conviction, but we vacate his sentence and remand for resentencing.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**